STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-284

WADE THOMPSON

VERSUS

IVY J. HEBERT, JR. &
AXIS SURPLUS INSURANCE COMPANY

**********

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. C-2017-396
HONORABLE E. DAVID DESHOTELS, DISTRICT JUDGE

**********

**WILBUR L. STILES**
**JUDGE**

**********

Court composed of Van H. Kyzar, Gary J. Ortego, and Wilbur L. Stiles, Judges.

**AFFIRMED.**

**Aaron Broussard**
**C. Barrett Rice**
**Jennifer David Khouri**
**Broussard Injury Lawyers**
**1301 Common Street**
**Lake Charles, LA 70601**
**(337) 439-2450**
**COUNSEL FOR PLAINTIFF/APPELLANT**
    **Wade Thompson**

**Michael S. Koch**
**Matthew J. Crotty**
**Neblett, Beard & Arsenault**
**2220 Bonaventure Court**
**P.O. Box 12120**
**Alexandria, LA 71315**
**(318) 561-2541**
**COUNSEL FOR PLAINTIFF/APPELLANT**
    **Wade Thompson**

**Kyle P. Kirsch**
**E. Madison Barton**
**Wanek Kirsch Davies, LLC**
**1340 Poydras Street, Suite 2000**
**New Orleans, LA 70112**
**(504) 324-6493**
**COUNSEL FOR DEFENDANT/APPELLEE**
    **Axis Surplus Insurance Co.**

**Rachel G. Webre**
**Morgan A. Druhan**
**Geiger, Laborde & Laperouse, LLC**
**701 Poydras Street, Suite 4800**
**New Orleans, LA 70139**
**(504) 561-0400**
**COUNSEL FOR DEFENDANT/APPELLEE**
    **Ivy J. Hebert, Jr.**

**STILES, Judge.**

On March 1, 2023, the trial court rendered judgment granting Defendant Axis Surplus Insurance Company's Motion to Enforce Settlement, enforcing the parties' High/Low Agreement and dismissing Plaintiff Wade Thompson's claims with prejudice. The same judgment denied Mr. Thompson's Motion for Judgment Notwithstanding the Verdict and/or New Trial as moot. Mr. Thompson appeals the trial court's judgment, asking this court to reverse the judgment enforcing the High/Low Agreement and to remand this matter to the trial court for consideration of his Motion for Judgment Notwithstanding the Verdict and/or Motion for New Trial. For the reasons set forth below, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

Plaintiff Wade Thompson ("Mr. Thompson") and Defendant Ivy Hebert ("Mr. Hebert") were involved in an automobile accident on September 8, 2017. Mr. Hebert was attempting to turn left at an intersection when he collided with Mr. Thompson's vehicle as it was passing him on the left side. As a result of the accident, Mr. Thompson sustained a serious ankle injury. When the ankle failed to heal properly, Mr. Thompson's leg was amputated below the knee. Mr. Thompson filed suit against Mr. Hebert and Axis Surplus Insurance Company ("Axis Surplus"), the insurer of the vehicle being driven by Mr. Hebert at the time of the accident, seeking damages for the injuries he sustained as a result of the accident.

A jury trial began in this matter on October 17, 2022, resulting in a jury verdict on October 24, 2022. During the trial, and before the jury rendered its verdict, Mr. Thompson and Axis Surplus entered into a settlement agreement, entitled the High/Low Agreement. That settlement agreement provides the following:

NOW INTO COURT, come Plaintiff, WADE THOMPSON, and Defendant, AXIS SURPLUS INSURANCE COMPANY, who advise that they have entered into a Settlement Agreement for all claims against all defendants in the captioned matter, known in the legal professions as a "High-Low" Agreement. The parties agree that the low shall be $1,000,000 and that the high shall be $4,500,000.

Further, this agreement is null and void should there be a hung jury or mistrial.

Plaintiff shall satisfy all liens, known and unknown, (including but not limited to Workers' Compensation, other medical health insurance, expert witness, attorney costs and fees, Medicare set aside if applicable, legal funding, etc.) related to this litigation. Plaintiff shall also release Defendants and their insurers for all claims, known or unknown, related to the litigation, the incident giving rise to the claim and damages sought. Plaintiff agrees to defend, indemnify and hold harmless Defendants and their insurers from any and all liens and claims arising from this litigation and settlement.

This agreement further includes a waiver, by Plaintiff, of interest, including pre-judgment and/or post-judgment and any interest awarded by the jury, which would accrue or be payable on any settlement amounts or amounts awarded by any judgment entered pursuant to this agreement. All parties shall bear their own costs and fees.

The parties recognize that verdicts are uncertain and that they have entered into this agreement of their own volition. Each party agrees to waive any right to appeal and sanctions based upon this agreement that said monies owed according to this agreement will be paid within sixty (60) days of the jury verdict.

Footnotes 1 and 2 of the High/Low Agreement state, respectively, that $1 million "[r]epresents the least amount which will be paid by or on behalf of defendants **regardless** of what the jury verdict is **at the completion of trial**[,]" and $4.5 million "[r]epresents the most which will be paid by or on behalf of defendants **regardless** of what the jury verdict is **at the completion of trial**, exclusive of interest and cost." (Emphasis added.)

On October 24, 2022, the jury found that both Mr. Hebert and Mr. Thompson were negligent and that their negligence was a legal cause of the crash, assigning Mr. Hebert with forty-seven percent of the fault and Mr. Thompson with fifty-three

percent of the fault. The jury further found that Mr. Thompson's injuries were causally related to the crash, awarding him the following amounts in damages: $1,393,535.40 in past medical expenses; $23,000.00 in future medical expenses; $159,036.00 in past loss of earnings; and $9,480.00 in future loss of earnings. The jury, however, wrote "0" on the verdict form next to each of the following items of general damages: disfigurement; disability; past physical pain and suffering; future physical pain and suffering; past loss of enjoyment of life; future loss of enjoyment of life; past emotional distress and inconvenience; and future emotional distress and inconvenience.

The trial court rendered a Judgment on Jury Verdict on December 5, 2022, making the jury verdict a judgment of the court and awarding Mr. Thompson $744,974.16. That amount represents forty-seven percent of the total amount awarded to Mr. Thompson by the jury, subtracting from the total amount the fifty-three percent by which Mr. Thompson was found to be at fault for the crash. As the jury verdict awarded Mr. Thompson less than $1 million, Axis Surplus tendered $1 million to Mr. Thompson in accordance with the High/Low Agreement. The check for $1 million was received by Mr. Thompson on November 1, 2022, which was within sixty days of the jury verdict.

On December 14, 2022, Mr. Thompson filed a Motion for Judgment Notwithstanding the Verdict and/or New Trial ("Motion for JNOV") solely on the issue of the jury's failure to award him any general damages. Mr. Thompson asserted that the jury found that his injuries were caused by the accident at issue, which in turn was caused, at least in part, by Mr. Hebert's negligence. Furthermore, the jury awarded him special damages representing his past and future medical expenses and his past and future loss of earnings. Based on these findings by the jury, Mr.

3

Thompson argued that it is beyond dispute that he suffered a serious injury and will continue to have pain and disability for the rest of his life. He further argued that a JNOV is warranted when a jury finds a defendant caused a plaintiff's injuries but fails to award general damages.[1] Thus, Mr. Thompson submitted that the trial court should grant his motion for JNOV on the issue of general damages and award him reasonable damages, as follows: $2,500,000 for disfigurement; $1,000,000 for disability; $2,500,000 for past physical pain and suffering; $500,000 for past loss of enjoyment of life; $500,000 for past emotional distress and inconvenience; $250,000 for future physical pain and suffering; $500,000 for future loss of enjoyment of life; and $500,000 for future emotional distress and inconvenience. Alternatively, Mr. Thompson asked the trial court to grant a new trial limited to the issue of general damages.

On December 15, 2022, Axis Surplus filed a Motion to Enforce Settlement, asking the trial court to enforce the settlement agreement reached between the parties pursuant to the High/Low Agreement as Axis Surplus had paid all amounts owed to Mr. Thompson per that agreement and, thus, Mr. Thompson's claims should be dismissed with prejudice. Axis Surplus further argued that Mr. Thompson's Motion for JNOV violated the express language of the settlement agreement, whose terms were triggered when the jury rendered its verdict.

A hearing was held on February 15, 2023, for both Axis Surplus' Motion to Enforce Settlement and Mr. Thompson's Motion for JNOV,[2] after which the trial

---

[1] Mr. Thompson cites *Labauve v. Central Mutual Insurance Co.*, 491 So.2d 146, 148 (La.App. 3 Cir. 1986), in which this court held, "Our courts have recognized that a jury cannot award special damages for personal injuries incurred in an accident and refuse to award any amount in general damages for injuries that present objective symptoms."

[2] We note that Axis Surplus filed two of its own motions for JNOV which were also heard on this date: (1) a Motion for Judgment Notwithstanding the Verdict to Conform to Axis' Policy

4

court held that it was enforcing the High/Low Agreement and, thus, denying the Motion for JNOV. The trial court specified that it was not denying the Motion for JNOV on its merits; it was simply not considering the motion on its merits. The trial court gave lengthy reasons on the record for its decision:

> [O]ne of the main issues that we see here in the Ivy Hebert matter is a question about whether the High/Low Agreement leaves the door open for post-verdict motions, specifically post-verdict motions for JNOV or New Trial. That is one of - - obviously the main issue. The Defense, excuse me, the Plaintiff says that it does and has in fact filed a JNOV. Plaintiff is willing to accept the findings of the jury concerning, of course, their denial of the intoxication defense. Plaintiff also accepts their findings perhaps concerning the issues of fault or comparative fault wherein they assessed fault, forty-seven percent (47%) to one and thirty-three - - excuse me, fifty-three percent (53%) to the other. The Plaintiff accepts the jury's award of specials, including over 1.3 million dollars for medical expenses and some one hundred and sixty thousand dollars for lost wages. Plaintiff of course argues that the jury got it completely wrong because their client lost a leg, that the jury awarded zero dollars for any general damages. And of course they are asking the Court to fix that in this JNOV. During the trial the Plaintiff argued - - Plaintiff's attorneys argued if the jury could award general damages to the tune of say fifteen million dollars or was it seventeen - - whatever it was, fifteen or seventeen million dollars, that is what they were asking the jury to consider. Let's explore that. If the Court would grant this Motion for JNOV and suppose the Court awarded general damages of fifteen million or maybe twenty million, I don't know, maybe twenty-five million, I think the law is that the decision is left up to the judge. . . . So suppose we went in that direction, and the Court awarded a JNOV to the Plaintiff for fifteen million, twenty million, all right. Where does that go? A judgment would be submitted to the Court. And the judgment would be submitted by the Plaintiff for fifteen million dollars. And the Defendant would say, no, no, no, we have a cap of 4.5 million dollars. Well, the Plaintiff would continue to argue that the High/Low Agreement does not cover post-verdict motions. The Plaintiff would logically argue that they are entitled to twenty million dollars. So, we would have to schedule that matter for a hearing in the future, two or three months from now, and the Court would have to make that decision of whether they are limited to 4.5 million or whether they - - or whether the Plaintiff gets twenty million. And once the trial court makes that

Limit; and (2) a Motion for Judgment Notwithstanding the Verdict on (a) the jury's determination that Mr. Thompson did not have a blood alcohol content of .08% or above at the time of the crash, and (b) the jury's determination that Mr. Thompson's injuries were causally related to the crash. While the trial court addressed these motions in its reasons for judgment given at the February 15, 2023 hearing and in the March 1, 2023 judgment, we do not address them in this opinion as Axis Surplus has not appealed the trial court's denial of these motions as moot.

decision then the issue would probably go to the Court of Appeal, obviously. Which will take more months, maybe a year. And that issue will have to be decided. But guess what, the High/Low Agreement says that no one can appeal. So, that issue will have to be decided in future litigation as well. And this case will drag on and on. And this is a 2017 case. So, let's take the opposite opinion. Cause if the door is opened for post-verdict motions the Defense now argues that they are entitled to a JNOV on the grounds that they have stated. The Defense argues that they were able to present evidence in the form of Dr. George and others that they seem to think can clearly show that Plaintiff was intoxicated or his blood alcohol level was above .08% BAC. They made their argument that perhaps, you know, that his impairment was twenty-five percent at fault or more in the accident. And according to the immunity statute 9:278 - - 98.4, whatever it is, of course they would argue that Plaintiff would get zero dollars, according to that immunity statute. Then the next issue would be do they get at least the minimum of one million dollars. Does Mr. Thompson get the minimum of a High/Low Agreement of a million dollars. But then the Defendant would use the same argument that the Plaintiff uses and say, no, you can't have your cake and eat it too. The High/Low Agreement does not cover post-verdict motions. Mr. Thompson gets zero. And then that issue will have to be decided in future litigation, either in district court, in the Court of Appeals, and that will take a very long time as well. The consideration in the High/Low Agreement was that Mr. Thompson would get something; and not nothing, a million dollars to 4.5 million dollars. The consideration would also be that he would get paid soon, sixty days - - the word, sixty days of the jury verdict. Paid within sixty days of the jury verdict. The consideration is that there were to be no appeals, especially after a case that has been dragging on for five years. . . . This case got to be quite complex. It all culminated in a week long jury trial. And the jury was asked to decide some difficult complex cases that were highly contested. They had to first of all decide whether or not the State proved their intoxication defense, and there were of course sub-parts to that. The jury next was called upon to handle issues like fault, how the accident occurred. There were sub-parts to that. There was evidence of passing in an intersection. Was Callahan Road an intersection? Was he allowed to pass in that? There was a statute on point that said you can't pass in an intersection. The Defendant was making a left turn across traffic, across another lane. There were issues about that, the jury had to decide, had to tackle. There were issues about whether the mirror, the side mirror, was working, how that came into play. The jury had to tackle that. The jury next had to apportion fault, which they did. And then in addition they had to decide the ankle injury, what the injuries [sic]. Did Mr. Thompson break his injury [sic] as a result of the car wreck or did he jump out and break his ankle when it popped? The jury had to tackle that issue. The jury next had to figure out mitigation of damages. There was evidence that if you don't stop smoking it will increase your risks of infection up to three hundred percent. There was evidence that Mr. Thompson continued to smoke

and that his ankle got infected and that he had his ankle amputated which increased the expenses, the medical expenses. The jury had to decide all of those things, and that is hard for them to do. . . . They do a good job at it in spite of the difficulties. It was obvious in the Court's opinion, even though Mr. Broussard says that it may have been a compromised verdict, maybe to find the person - - to get over the intoxication issue[.] . . . But the jury came back with a decision to deny Mr. Thompson any general damages, which does not make sense and it would not be proper except for if it was a compromised verdict, then it would make complete sense. And that brings us back to the High/Low Agreement. The consideration of the High/Low Agreement is that verdicts are uncertain, and that somebody is gonna [sic] walk away with something. So, if the Court took it the next level and granted JNOV for twenty million dollars for the Plaintiff, or if the Court granted JNOV for Defense and zeroed Mr. Thompson then that would just make the High/Low Agreement worthless where it could be thrown away and burned in the court - - burned in a trash can. That would lead to absurd consequences, in the Court's opinion. . . .

. . . .

. . . But that is gonna [sic] be the ruling of the Court is to deny the JNOV on the grounds that the Court recognizes the High/Low Agreement. I am not denying JNOVs on their merits. I am not considering the JNOVs on their merits. I was speaking purely hypothetical. . . .

. . . .

My point was that I am taking it to its logical conclusion. If the argument is that the High/Low Agreement leaves the door open for JNOVS then why would it limit it to 4.5 million. If I was a plaintiff's lawyer I would ask for whatever the JNOV was. Converse to that, if I was defense lawyer, using that logic that the High/Low Agreement is not effective, then I would make the argument that they would get zero. In my opinion you can't - - you can't - - it is either effective or it is not effective, and that is the reason.

A Judgment was signed by the trial court on March 1, 2023, granting Axis Surplus' Motion to Enforce Settlement, dismissing Mr. Thompson's claims in this matter with prejudice and denying Mr. Thompson's Motion for JNOV as moot.[3] On March 22, 2023, Mr. Thompson appealed "the Judgment GRANTING Defendants'

---

[3] The judgment also denied Axis Surplus' two motions for JNOV as moot.

Motion to Enforce Settlement, which Judgment was rendered orally on February 15, 2023, signed on March 1, 2023, and mailed on March 1, 2023." Mr. Thompson further states in his Motion and Order for Devolutive Appeal that in addition to seeking a devolutive appeal of the judgment, he is requesting "that the appellate court remand the case back to the trial court for a ruling on Plaintiff's Motion for Judgment Notwithstanding the Verdict and/or New Trial."

## ASSIGNMENTS OF ERROR

On appeal, Mr. Thompson has asserted the following two assignments of error:

1. The Trial Court erred by finding the High-Low Agreement waives the right to post-trial motions, as the High-Low Agreement contains no such waiver.

2. The Trial Court erred by refusing to consider and denying Mr. Thompson's Motion for JNOV as moot.

## DISCUSSION

### *Standard of Review*

The question at issue in this appeal is whether the High/Low Agreement permits the parties to seek post-trial motions once the jury has rendered its verdict. "Questions of contractual interpretation are likewise questions of law, which are subject to a de novo standard of review." *Johnson v. Allstate Prop. and Cas. Ins. Co.,* 21-552, p. 4 (La.App. 3 Cir. 4/27/22), 338 So.3d 109, 112. As stated by this court in *Derouen v. Nelson*, 09-467, p. 3 (La.App. 3 Cir. 3/10/10), 32 So.3d 1079, 1082, "When a trial court's interpretation of a contract is not based upon any factual findings, but, rather, is based upon a review of the contract's language, the manifest error standard of review does not apply." In making its decision to enforce the High/Low Agreement, the trial court conducted a review of the agreement's

language without basing its decision on any finding of fact. Thus, we shall review the trial court's judgment using a de novo standard of review, as questions of law are reviewed de novo and there are no questions of fact at issue here. *See Campbell v. Evangeline Par. Police Jury*, 14-1301 (La.App. 3 Cir. 5/6/15), 164 So.3d 408, *writ denied*, 15-1067 (La. 9/7/15), 176 So.3d 1043.

***Does the High/Low Agreement waive the right to post-trial motions:***

Mr. Thompson first makes it clear that he is not seeking to nullify or disregard the High/Low Agreement. While he acknowledges that the agreement is enforceable and does waive certain rights, such as interest, appeals, and sanctions, he maintains that there is no provision in the High/Low Agreement that can be interpreted to waive post-trial motions. Citing *Soileau v. Smith Tree Value and Rental*, 12-1711, p. 12 (La. 6/28/13), 144 So.3d 771, 780, Mr. Thompson argues that "[a] compromise settles only those differences that the parties clearly intended to settle," and thus "a compromise must clearly express the rights that the parties intended to settle." According to Mr. Thompson, therefore, he has the right to seek post-trial relief as a matter of law as that right was not waived by either party under the clear and explicit language contained in the High/Low Agreement. He cites *Arceneaux v. Amstar Corp.*, 10-2329, p. 18 (La. 7/1/11), 66 So.3d 438, 450-51, for the principle that "[w]aiver occurs when there is an existing right, a knowledge of its existence and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." Mr. Thompson also cites *Breaux v. Laird*, 230 La. 221, 88 So.2d 33, 38 (1956), in which the court stated, "the term 'waiver' . . . can be comprehensively defined as a voluntary and intentional relinquishment or abandonment of a known existing legal

9

right, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed."

Thus, Mr. Thompson argues that the since the clear and explicit words of the High/Low Agreement do not include any language waiving his right to file post-trial motions, allowing post-trial motions would not render the High-Low Agreement meaningless, leading to no absurd consequences.[4] Nor does Mr. Thompson believe that any language in the High/Low Agreement states that the jury verdict "triggered" a settlement, thereby ending the litigation. Mr. Thompson, therefore, submits that the trial court erred when it granted Axis Surplus' Motion to Enforce Settlement, disregarding the High/Low Agreement's clear, express terms and judicially creating a waiver of post-trial motions.

In its appellee brief,[5] Axis Surplus notes that the High/Low Agreement specifically provides that the parties "have entered into a Settlement Agreement for all claims against all defendants in the captioned matter[.]" The agreement further provides, "Plaintiff shall also release Defendants and their insurers for all claims, known or unknown, related to the litigation, the incident giving rise to the claim and damages sought." The trial court noted in its oral reasons for judgment at the February 13, 2023 hearing, "The consideration in the High/Low Agreement was that Mr. Thompson would get something; and not nothing, a million dollars to 4.5 million dollars. The consideration was also that he would get paid soon . . . within sixty days

---

[4] *See* La.Code Civ.P. art. 2046, which provides, "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties intent."

[5] Defendant/Appellee Axis Surplus has filed an appellee brief in response to Plaintiff/Appellant Mr. Thompson's appellant brief. Defendant/Appellee Mr. Hebert filed a separate brief, adopting "all facts, law, argument, evidence and requests for relief set forth in the brief filed on behalf of Defendant/Appellee Axis Surplus Lines Insurance Company, as if copied herein *in extenso*."

of the jury verdict." As stated in the High/Low Agreement, "The parties recognize that verdicts are uncertain and that they have entered into this agreement of their own volition."

Axis Surplus argues that these clear and explicit terms of the High/Low Agreement should be upheld because such an agreement is a favored means of resolution. Louisiana jurisprudence has a "strong policy favoring compromise agreements and finality of settlements." *Brown v. Drillers, Inc.*, 93-1019 (La. 1/14/94), 630 So.2d 741, 757. In *Joseph v. Huntington Ingalls Inc.*, 18-2061, pp. 18–19 (La. 1/29/20), 347 So.3d 579, 593, the supreme court concluded:

> The jurisprudence of Louisiana has a long-stated, strong public policy favoring compromises:
>
> > The law in its wisdom, and out of solicitude to end or avert threatened litigation, encourages settlement of disputes by compromise, and does not sanction the solemn acts of contending parties settling their disagreements being lightly brushed aside, unless there be present evidence of bad faith, error, fraud, etc. If such were not the law, there would be little incentive to any one [sic] to part with anything of value in the desire to escape the harassments of litigation. A compromise agreement, when freely entered into, is intended to have the binding effect of the thing adjudged. The law has ordained that such transactions have the dignity and force of a definitive judgment, in so far as definitely and irrevocably fixing the rights and liabilities of the parties thereto, as relates to the subject-matter dealt with. It is simply the act of the parties determining their own liabilities and obligations, instead of the court.

*Beck v. Continental Cas.Co.*, 145 So. 810, 811 (La.App. 2 Cir. 1933).

Further citing the supreme court's opinion in *Joseph*, 347 So.3d at 587, Axis submits that, as a compromise, the High/Low Agreement should be interpreted using "the same general rules of contractual interpretation applicable to contracts." "When words of a contract are clear and explicit and lead to no absurd consequences, no

11

further interpretation may be made in search of the parties' intent. [La.Civ. Code art.] 2046. The aim of contractual interpretation is the discernment of a compatible meaning to all provisions of an agreement." *Dugas v. Modular Quarters, Inc.*, 561 So.2d 192, 198 (La.App. 3 Cir. 1990) (*citing Investors Assoc. Ltd. v. B.F. Trappey's Sons*, 500 So.2d 909 (La.App. 3 Cir.), *writ denied*, 502 So.2d 116 (La.1987)).

Mr. Thompson has argued that nothing in the High/Low Agreement triggers the settlement upon the jury reaching a verdict. However, Axis Surplus counters that such a reading of the agreement is contrary to its plain terms. According to Axis Surplus, the clear language of the High/Low Agreement, wherein it reads that the "monies owed according to this agreement will be paid within sixty (60) days of the jury verdict[,]" confirms that the duty to pay arises "within sixty (60) days of the jury verdict." Furthermore, the amount of monies owed is determined "at the completion of trial[,]" as clearly stated in footnotes 1 and 2 of the agreement. "[E]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Specialty Retailers, Inc. v. RB River IV LLC*, 17-490, p. 5 (La.App. 3 Cir. 1/4/18), 237 So.3d 63, 67, quoting *Van Mol v. Beasley*, 15-869, p. 4 (La.App. 3 Cir. 2/3/16), 184 So.3d 280, 284. Thus, according to Axis Surplus, any argument that Mr. Thompson somehow reserved the right to have the jury verdict reviewed at the completion of the trial, when the amount owed is due within sixty days of the jury verdict, is contrary to the agreement's terms, which, when read as a whole, provide that it takes effect when the jury verdict is rendered.

As stated in *Brown*, 630 So.2d at 747:

[Louisiana Civil Code Article] 3071 defines a compromise as "an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the

manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing." [Louisiana Civil Code Article] 3078 declares that the effect of a compromise has the legal efficacy of a judgment, possessing "a force equal to the authority of things adjudged," and that a compromise "can not be attacked on account of any error in law or lesion." [La.Civ. Code art.] 3078; *see Salling Wiping Cloth Co. v. Sewell, Inc.*, 419 So.2d 112, 114 (La.App. 2d Cir. 1982).

The supreme court further noted that La.Civ.Code art. 3071 "provides that a compromise is a written contract[,]" and, as such, "the compromise instrument is governed by the same general rules of construction applicable to contracts." *Id.* at 748. Additionally, "courts are guided by the general principle 'that the contract must be construed as a whole and in light of attending events and circumstances.'" *Id.*

In analyzing the settlement agreement at issue in this case, the High/Low Agreement, we look to this court's discussion of contractual interpretation laid out in *Dugas*, 561 So.2d at 198:

When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. [La.Civ.Code art.] 2046. The aim of contract interpretation is the discernment of a compatible meaning to all provisions of an agreement. *Investors Assoc. Ltd. v. B.F. Trappey's Sons*, 500 So.2d 909 (La.App. 3rd Cir. 1987), *writ denied*, 502 So.2d 116 (La.1987). Louisiana contracts are interpreted in light of the common intent of the parties, and in light of all of the provisions, so that each provision is given the meaning suggested by the contract as a whole. [La.Civ. Code arts.] 2045, 2050. In ascertaining the parties' common intentions to the contract, recourse must first be obtained by construing the contract or agreement as a whole; if that process is not determinative, then the next subject of inquiry is the discernment of the circumstances surrounding the parties at the time of contracting. *Investors Assoc. Ltd.,* supra at 912. Contracts, subject to interpretation from the four corners without the necessity of extrinsic evidence, are interpreted as a matter of law. *Id.*

Thus, we must look to the clear, explicit language of the High/Low Agreement to determine the common intent of Mr. Thompson and Axis Surplus when entering into

the agreement, as well as to interpret the agreement so as to give meaning to each provision "suggested by the contract as a whole." *Id.*

The High/Low Agreement specifically states the following:

> NOW INTO COURT, come Plaintiff, WADE THOMPSON, and Defendant, AXIS SURPLUS INSURANCE COMPANY, who advise that they have entered into a Settlement Agreement **for <u>all claims</u> against all defendants in the captioned matter**, known in the legal professions as a "High-Low" Agreement. The parties agree that the low shall be $1,000,000 and that the high shall be $4,500,000.
>
> . . . .
>
> . . . Plaintiff shall also release Defendants and their insurers for **<u>all claims</u>, known or unknown, related to the litigation, the incident giving rise to the claim and damages sought**.

(Emphasis added) (footnotes omitted). Thus, both parties, including Mr. Thompson, agreed to settle this matter, with Mr. Thompson agreeing to "release" the defendants Mr. Hebert and Axis Surplus "for ***all claims***, known and unknown, related to the litigation, the incident giving rise to the claim and damages sought." (Emphasis added.) We find that the words "all claims," stated multiple times in the agreement, include Mr. Thompson's claim for general damages. Mr. Thompson, therefore, agreed to settle his claim for general damages against Defendants Axis Surplus and Mr. Hebert and to release them from this claim when he signed the High/Low Agreement.

The High/Low Agreement further states, "The parties recognize that verdicts are uncertain and that they have entered into this agreement of their own volition." Thus, we find that the parties' intent in entering into the settlement agreement was to ensure that Mr. Thompson would be paid at least $1 million, while ensuring that Axis Surplus would not have to pay him more than $4.5 million. By acknowledging in the clear language of the settlement agreement that "verdicts are uncertain", the

14

parties made it clear that they were aware they would each be receiving a benefit—"regardless of what the jury verdict is at the completion of trial,"[6] This language is clear and unambiguous. Mr. Thompson agreed to the terms "regardless" of "what the jury verdict is[.]" These broad terms would include a jury verdict "at the completion of trial" that did not contain an award for general damages. The returning of the verdict by the jury at the completion of trial triggered the agreement of the parties, regardless of its nature. By these terms, Mr. Thompson would not walk away from trial empty-handed, and Axis Surplus would not have to pay him more than $4.5 million. Mr. Thompson also benefits from the clause in the settlement agreement that provides "said monies according to this agreement will be paid within sixty (60) days of the jury verdict[,]" a short, precise timeline for the payment of the money owed to him pursuant to the agreement. The concession that both parties made when entering into this settlement agreement was that they would each waive any right to appeal and any right to sanctions as long as the money owed to Mr. Thompson was paid to him within sixty days. Axis Surplus complied with the terms of the High/Low Agreement when it issued a check to Mr. Thompson in the amount of $1 million, which was received by him within sixty days of the jury's verdict.[7]

Thus, we find that the clear language of the High/Low Agreement evidences an intent by the parties to end this lawsuit and adjust their differences by mutual consent, in a manner upon which they both agreed. *See Brown*, 630 So.2d 741. By entering into this settlement agreement, each party gained an advantage in return for waiving certain rights. There is an old adage, "a card laid is a card played". Allowing

---

[6] *See* footnotes 1 and 2 of the High/Low Agreement.

[7] Evidenced by the FedEx delivery receipt filed into the record.

Mr. Thompson to file post-trial motions would lead to the absurd consequence of nullifying the clear intent of the parties to settle "all claims" arising from this accident at issue in this litigation. We, therefore, affirm the trial court's decision to grant Axis Surplus' Motion to Enforce Settlement and deny Mr. Thompson's Motion for JNOV as moot.

***Did the trial court err by refusing to consider and denying Mr. Thompson's Motion for JNOV as moot:***

As we have found that the trial court did not err in granting the Motion to Enforce the Settlement, thereby affirming its decision that Mr. Thompson was prohibited from filing post-trial motions, we further find that the trial court did not err when it denied Mr. Thompson's Motion for JNOV as moot.

**DECREE**

For the foregoing reasons, we affirm the trial court's March 1, 2023 Judgment granting Defendant/Appellee Axis Surplus Insurance Company's Motion to Enforce Settlement, dismissing Plaintiff/Appellant Wade Thompson's claims with prejudice, and denying Wade Thompson's Motion for Judgment Notwithstanding the Verdict and/or New Trial as moot. All costs of this appeal are assessed to Wade Thompson.

**AFFIRMED.**